**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**JOSEPH EUGENE OSBORNE**                                              **PETITIONER**

**VS.**                                    **CIVIL ACTION NO.: 3:13CV784-WHB-RHW**

**MARSHALL FISHER, Commissioner,**
**Mississippi Department of Corrections**
**and JIM HOOD, Attorney General of**
**the State of Mississippi**                                          **RESPONDENTS**

═══════════════════════════════════════════════════════════════════════

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Joseph Eugene Osborne was convicted of murder and sentenced to life in the Circuit

Court of Lauderdale County on April 7, 2004.  He appealed his conviction to the Mississippi

Court of Appeals, which denied relief.  *Osborne v. State*, 942 So. 2d 193 (Miss. App. 2006).

Osborne petitioned the Mississippi Supreme Court for certiorari, but that relief was also denied.

942 So. 2d 164 (Miss. 2006).  On November 14, 2012, Osborne submitted an Application for

Post-Conviction Relief in the Mississippi Supreme Court.  On May 29, 2013, that court rejected

Osborne's petition, *Osborne v. State*, No. 2012-M-1845 (Miss. May 29, 2013).

Seven months later, on December 17, 2013, Osborne filed a Petition for Writ of

Habeas Corpus in this Court.  The Court has carefully reviewed the Petition and the

related pleadings and briefs submitted by the parties, and, for the reasons more fully set

out below, finds that Osborne's Petition should be dismissed.

## FACTS

Charlie Hopkins died on November 6, 2002, in his mother's home in Meridian.

At the time of his death, Charlie was five years old.  He and his younger brother, Sam,

lived with their mother, Cindy Hopkins.  On the night Charlie died, however, there were

two other adults in the house – Joseph ("Joey") Osborne, Cindy's live-in boyfriend, and Joey's friend, Kimble Frazier.  When Cindy awoke the next morning, she fed Sam breakfast, and, around 10:00 a.m., went into the boys' bedroom to wake Charlie.  Charlie was dead, and there were Zyrtec pills spilled on the bed and the floor.

Initially, investigators considered Charlie's death to be the result of an overdose. During the autopsy, the pathologist, Dr. Steven Hayne, noted several abrasions and bruises on Charlie's face and body.  Among the other injuries, Dr. Hayne observed several petechiae, which are small areas of hemorrhage often found in cases of respiratory death.  There was no Zyrtec in Charlie's blood, and no pill material was found in Charlie's stomach.  According to Dr. Hayne, the injuries to Charlie's face were consistent with a person having covered Charlie's nose and mouth with his hand, and he determined that Charlie was suffocated.

Cindy Hopkins was the first witness who testified at Osborne's trial.  She described Osborne as her boyfriend, and she said that he had been staying at her house for a couple of weeks, waiting for rain to stop so he could paint a house.  Although Joey's relationship with her sons had started well, after two weeks, Charlie, in particular, wanted him to leave.  A few days before Charlie's death, the family caught some sort of stomach disorder, one at a time.  By the day Charlie died, Cindy had caught it, and she went to bed around 2:00 that afternoon.  Joey gave Cindy some Phenergan and a muscle relaxer, so she could sleep, and she slept until about 10:30 that night.

Cindy testified that, when she woke up, Kimble Frazier was at her house, visiting Joey.  On her way to the kitchen, she stopped in her boys' room to check on them, and they appeared to both be asleep.  She almost brushed Charlie's teeth while he was in bed,

which was something she did often, but decided that she did not want to wake him. Cindy left the room without touching either of her boys.

Cindy got something to eat and stayed up until around 1:30 a.m., talking to Joey and Kimble. She stopped off to check on the children, and noticed that Joey had followed her and turned off the blue light from the videorecorder that was on the television screen. Joey came up behind Cindy and distracted her from touching Charlie. She did remember later that there were no pills around Charlie when she saw him.

At about 8:00 a.m., Cindy woke after Sam came into her bedroom. They watched television and ate breakfast until about 10:00 a.m., when Cindy decided to go check on Charlie. Charlie would not wake up, and she saw pills all around him, as well as a pill bottle. When she pulled the covers off Charlie, she saw that he was already blue.

Kimble Frazier also testified at trial. He had been friends with Joey since he worked for him a few years previously. Kimble knew that Joey was living with Cindy Hopkins, and he had visited there a couple of times prior to Charlie's death. During this visit, they sat in the living room with the children for a while, and Kimble read a book to Sam. Then they went outside to play. According to Kimble, they ate supper with the children at about 5:30 to 6:00, and Cindy joined them shortly after. Then the children were put to bed, Cindy and Joey went to bed about 10:30, and Kimble went to sleep on a day bed in the living room. Kimble got up twice during the night to go to the bathroom, and both times he opened the door to Charlie and Sam's bedroom to check on them, but saw nothing out of the ordinary. After the second trip, Kimble did not wake up again until after Cindy had found Charlie dead.

Joey Osborne did not testify at trial; however, Darrell Theall, an investigator with the Meridian Police Department, interviewed Osborne, and summarized that interview as follows:

> He told me that Cindy had called and asked him if he could come over and help with the kids because she was sick. He said he would, and he went over. He said about 4:00 o'clock that day Mr. Kimble, Kimble Frazier, came over. It was about 4:00 o'clock. He said he fed the kids. He said that he fed the kids between 7:00 and 8:00 o'clock and that after they ate they built a fire and that Mr. Frazier was looking at a book with Sam and Charlie was just watching the fire.

> After that, about 9:00 o'clock, he said that the boys were taking a bath. And he said that he went in Cindy's room to check on her and she was still asleep. At that time he got clothes for the children and then he went to the bathroom to get the boys out and Charlie was already out of the tub drying off.

> Then he stated that the boys got out of the tub and he put a movie on for the boys to watch so they could go to sleep. He said that about 10:30 that he went to check on the boys and he said that Sam was asleep and Charlie was still up watching TV and he told Charlie that he needed to go to bed because his mother was going to take him to school the next morning.

> He said about 10:30 is when this happened, and Cindy got up. And he said that Cindy went into the boys' room and brushed their teeth and cut off the television. And he said that was about the time that he went to bed.

> . . . .

> Then shortly after that he said that – about 30 minutes after that he stated that Cindy came to bed with him and then the next morning he woke up to her screaming – I'm sorry. He woke up to Kimble knocking on the door waking him up and then heard Cindy screaming about Charlie.

> . . . .

> He said that Cindy went to check on the boys at about 2:00 o'clock in the morning and that they were okay.

During his investigation, Officer Theall viewed the photographs from Charlie's autopsy, and he noticed bruising on Charlie's face, forehead, and cheek. During a discussion between Theall and some people in the District Attorney's Office, they decided to exhume Charlie's body and make a mask, or replica, of Charlie's head, to aid Dr. Hayne in explaining to the jury where the bruises were located.

After Charlie's death was determined to be a homicide, the Department of Human Services removed Sam from Cindy's home. Cindy's niece, Alex Thompson, was permitted to keep him. A few weeks later, Cindy was at her parents' house with her sister, Ellen, her mother, and Sam. Cindy testified at trial that, when Ellen tried to get Sam ready for bed, he said that all Charlie wanted to do that night was to watch TV, and Charlie wouldn't go to bed. He said that Joey chased him out of the room and back in; then Joey spanked Charlie and held him down with his hand over Charlie's nose and mouth. The morning after Sam told this story, Cindy called the police. Shortly after, in early December, Sam was interviewed by a female police detective, but "it didn't really go too successfully."

By spring, the Attorney General's office had arranged for Sam to see Dr. Catherine Dixon, a children's forensic psychiatrist in Jackson. Dr. Dixon interviewed Sam briefly, and she testified at trial that Sam told her, "[W]e had a bad guy in our house, and he killed Charlie." He said Joey killed Charlie by taking his breath away, and he illustrated it by putting his hand over his own mouth. Sam related to Dr. Dixon that Joey had chased Charlie around, with Sam following, unseen. He said that Joey and Charlie went outside, "but they weren't having fun; they were doing the fight." When they came back to the room, Charlie climbed up the walls, and then Joey killed him. Dr. Dixon

asked Sam if he could demonstrate how it was done by using a doll, and Sam put his

hand palm down on the doll's mouth.  According to Dr. Dixon, Sam's age, the language

that he used and his demeanor, were all indicia of credibility.

Sam's competence to testify and the admission of his earlier statement through

Dr. Dixon were the subject of a pretrial hearing, at which Sam, his mother, his

grandmother, and his Sunday school teacher testified.  The trial judge ruled that Sam was

competent to testify and that his out-of-court statements to family members and to Dr.

Dixon were admissible under Miss. R. Evid. 803(4) and (24).

Dr. Steven Hayne was the last witness called at trial.  As set forth earlier, Dr. Hayne's

observations of Charlie's injuries, as well as the absence of Zyrtec in his blood sample,

convinced Dr. Hayne that his death was the result of suffocation, and not an overdose.  He

described those injuries to the jury through photographs taken during Charlie's autopsy, as well

as diagrams that he prepared to show the location of those injuries.  Dr. Hayne also described for

the jury the exhumation of Charlie's body that was done to create a "moulage," or death mask.

The casting was done by a Navy officer who was a forensic odontologist.  Dr. Hayne took the

casting and transferred the information from his diagrams onto it, for the purpose of

demonstrating the size of the hand that could have caused the injuries.  In his opinion, the

markings were consistent with a larger hand, and he believed that it was more likely the hand of

a male, although he admitted during cross-examination that a female with large hands could also

have inflicted the injuries.

Hayne also testified that food matter was in the stomach, and a small portion of it had

entered the small bowel.  Based on this observation, Hayne testified that Charlie had died about

an hour or an hour and a half after eating.  On cross-examination, he expanded the time frame to

possibly, two hours, but no more, although he admitted that it was possibly longer.  He also testified that normal physical activity would not speed up the process, although inactivity could slow it down.  Disease and severe emotional stress could have an impact.

Based on this evidence and testimony, Osborne was convicted of murder.  In his direct appeal, Osborne argued that he was denied a fair trial when the trial court permitted Sam Hopkins to testify, admitted hearsay statements that Sam made before trial, and permitted Dr. Dixon to testify as to Sam's credibility.  *Osborne*, 942 So. 2d at 194.  The Court of Appeals found that the trial judge made sufficient findings to support his decision that Sam was competent to testify, and the jury apparently found his testimony to be credible.  *Id*. at 197.  The Court found that the hearsay testimony was admissible under Rule 803(4) as a statement made for the medical purpose of having Dr. Dixon assess Sam and recommend further treatment.  *Id*. at 197-98.  The hearsay was also admissible as the rare circumstance under Rule 803(24), based on the trial judge's findings as to reliability.  As to Osborne's claim that Dr. Dixon was improperly permitted to comment on Sam's veracity, the court found that her testimony actually concerned the indicators that she looks for in assessing a child witness.  Her opinion was that Sam's demeanor and mannerisms were consistent with those indicators.  *Id*. at 200.  The Court of Appeals also rejected Osborne's argument that life scene photographs of Charlie and Sam were inadmissible, as well as his argument that the evidence was insufficient to sustain the verdict.  *Id*. at 201-02.

Finally, Osborne argued that his trial counsel was ineffective on several grounds, all of which were rejected.  *Id*. at 201-02.  In particular, he noted that, although counsel objected to the use of the "death mask," the objection was based on his allegation that he

had not seen it before.  Because the evidence had been available for review for months,

the trial judge denied the objection.  The Mississippi Supreme Court considered

Osborne's claims, but found that his trial counsel did not render ineffective assistance.

Osborne's conviction was affirmed.  *Id*. at 202-03.

Osborne's Petition for Post-Conviction Relief, filed six years after his conviction was

affirmed, relied entirely on claims surrounding Dr. Hayne's qualifications, testimony in other

trials, and his testimony in Osborne's trial.  The Mississippi Supreme Court denied relief,

summarizing the grounds as follows:

> In the present application, Osborne maintains that he has obtained
> evidence regarding Dr. Steven Hayne's alleged arrangement with the State,
> professional qualifications, and instances of "forensic fraud," all of which
> purportedly constitute "newly-discovered evidence."  *See* Miss. Code Ann. §§ 99-
> 39-5(2)(a)(i), 99-39-27(9).  Relatedly, Osborne raises claims of alleged violations
> of "fundamental constitutional rights based upon such "newly-discovered
> evidence" (i.e., violations of Osborne's: (1) due process rights under *Napue v.
> Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3L.Ed. 2d 1217 (1959), via the presentation
> of false evidence during trial; (2) due process rights under *Brady v. Maryland*,
> 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); (3) substantive right to a
> fair trial via "gross violations of [the] Rules of Evidence" (namely, Mississippi
> Rule of Evidence 702); and (4) rights under the Confrontation Clause)).
>
> After due consideration, the panel finds that Osborne's claim of "newly-
> discovered evidence" is without merit as the subject evidence was "reasonably
> discoverable at the time of trial" and/or not "of such nature that it would be
> practically conclusive that, if it had been introduced at trial, it would have caused
> a different result in the conviction or sentence."  Miss. Code Ann. §§ 99-39-
> 5(2)(a)(i), 99-39-27-(9).  As such, that claim is time-barred and should be denied.
> Since Osborne's alleged "fundamental" constitutional claims are predicated
> upon evidence which is not "newly-discovered," the panel finds that those claims
> are waived.  *See* Miss. Code Ann. § 99-39-21(1).  Alternatively, the panel finds
> that Osborne's alleged "fundamental" constitutional right claims are without
> merit and should be denied.  Finally, the panel finds that Osborne has failed to
> present a substantial showing of the denial of a state or federal right.
> Accordingly, the panel finds that Osborne's present application should be denied.

*Osborne v. State*, No. 2012-M-1845, order at 1-2 (Miss. May 29, 2013).  In his habeas

petition in this Court, Osborne's claims are likewise premised upon alleged misconduct

of Dr. Hayne.  As they did in state court, the Respondents argue that the claims are time-barred, but under federal, rather than state, law, and they have moved the Court to dismiss on those grounds.  For the reasons set out below, the undersigned is of the opinion that the Respondents' motion should be granted.

## **STANDARD OF REVIEW**

In 1999, the Supreme Court's Ad Hoc Committee on Federal Habeas Corpus in Capital Cases published a report on the excessive delays of capital cases that were caused by perceived abuses of the writ of habeas corpus.  Lewis F. Powell, Jr., *Capital Punishment*, 102 Harv. L. Rev. 1035, 1039 (1989).  In response, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") to correct those abuses.  Pub. L. 104-132, 110 Stat. 1244 (codified at 28 U.S.C. 2254 (2006)); *Baze v. Rees*, 553 U.S. 35, 69 (2008) (Alito, J., concurring) (stating that the AEDPA "was designed to address this problem.").  According to the Conference Committee Report that attended the passage of the bill:

> This title incorporates reforms to curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases.  *It sets a one year limitation on an application for a habeas writ and revises the procedures for consideration of a writ in federal court.*  It provides for the exhaustion of state remedies and requires deference to the determinations of state courts that are neither "contrary to," nor an "unreasonable application of," clearly established federal law.

H.R. Conf. Rep. 104-518, 94th Cong., 2d Sess. 111 (1996) (emphasis added).   The one-year statute of limitations provided by AEDPA begins from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

If calculated from the date that his judgment became final, Osborne's habeas petition was not filed within the one-year limitations period provided by AEDPA. Osborne argues that his habeas petition was timely filed pursuant to §2244(d)(1)(D) because he did not know of the factual predicate of his claims until Dr. Hayne was deposed in a federal case in 2012. The Respondents counter that the information on which Osborne's claims are based was widely known prior to that date. Having reviewed the pleadings, the supporting material, and the records of this Court, the undersigned is of the opinion that Osborne's claims are based on information that was known, or discoverable by due diligence, well before Hayne's deposition. For that reason, the undersigned is of the opinion, and so recommends, that this case be dismissed.

## ANALYSIS

Osborne's petition for a writ of certiorari to challenge his conviction in state court was denied on November 16, 2006. He did not seek review from the United States Supreme Court, so his conviction became final after the expiration of the ninety-day period during which he *could* have sought such review, or on February 14, 2007. AEDPA's statute of limitations required him to file his habeas petition within a year of that date, or February 14, 2008. The limitations period could have been tolled during the pendency of a post-conviction petition in state court; however, Osborne did not file a post-conviction petition in state court until November 14, 2012. By that time, the one-year limitations period provided by AEDPA had

10

long-since expired.  He did not file his habeas petition with this Court until December 17, 2013 –

over five years after the due date.

Osborne argues that the one-year period did not begin to run until the factual predicate

for his claims was discovered, which he contends could not have occurred before May 25, 2012.

As stated in his Opposition to the Respondents' Motion to Dismiss:

> The factual predicates for Osborne's claims arise primarily from the same four
> pieces of newly discovered evidence:  the State's business arrangement with Dr.
> Hayne, as evidenced primarily by the letters between Mississippi Public Service
> Commissioner Jim Ingram and the Ethics Commission; the ABP exam that Dr.
> Hayne took and failed; Dr. Hayne's undergraduate record; and a body of
> information – in the form of trial transcripts, autopsy reports, and other trial
> materials – that represents a career's worth of pseudo-scientific time and cause of
> death testimony.  Each piece of evidence was obtained by the Mississippi
> Innocence Project in 2012 in the course of, or alongside, discovery conducted as
> part of the federal lawsuit *Hayne v. Innocence Project*, No. 3:09-cv-218 (S.D.
> Miss.).  Each piece of evidence was used in an April 26-27, 2012, deposition of
> Dr. Hayne.  By court order, the transcript of that deposition was confidential until
> May 25, 2012 – the earliest date that any third party, including, obviously, an
> incarcerated third party, could have possibly discovered the evidence.

Opp. To Mot. To Dismiss 23-24 (footnotes omitted).  The undersigned disagrees with Osborne's

contention.

Osborne presented the same evidence and arguments to the Mississippi Supreme Court as

part of his Application for Post-Conviction relief, in which he contended that his claims were not

barred by the State's three-year limitations period for such actions.  That court found that the

evidence was reasonably discoverable at the time of trial and/or was not of such nature that it

would have caused a different result if it had been introduced.  Similar arguments and factual

matters were presented in a case involving another habeas petitioner in the Northern District of

Mississippi.  *Ross v. Epps*, No. 4:14-cv-87-SA-JMV (N.D. Miss.).  The issue there was whether

the Petitioner, John Ross, had satisfied the requirements of 28 U.S.C. § 2244(b)(2)(B)(i) and (ii)

for consideration of a successive petition.  For that purpose, the petitioner had to show both that

11

the facts supporting the petition could not have been previously discovered through the exercise of due diligence *and* that if those facts had been produced at trial, no reasonable juror would have found him guilty.

U.S. Magistrate Judge Jane Virden considered Ross's allegations individually and ultimately concluded that they did not satisfy the requirements for a successive petition.  With regard to Hayne's business relationship with the State of Mississippi, Judge Virden found that it was "uncontested that the details of Hayne's actual relationship with the state were well-known both at the time of Ross's trial and available to Ross prior to filing his first habeas petition and its 2005 amendment."  *Ross*, Rep. & Recomm. at 21, [Doc. #23] (July 30, 2015).  In support of that finding, Judge Virden noted that Hayne's testimony in Ross's own trial gave an annual number of autopsies exceeding what other experts deemed reasonable.  Judge Virden then considered Ross's claim that Hayne testified falsely at his trial to being board certified in forensic pathology.  Citing a 2008 article in the *Clarion Ledger* newspaper, testimony given in a civil case in 2001, and generally available information on forensic pathology certification, Judge Virden held that the information was not newly discoverable.  *Id*. at 28.  As to his failure of the American Board of Pathology's certification exam in 1989, Judge Virden relied on Dr. Hayne's testimony in a 1999 case out of Warren County in which the subject was discussed.  Ross claimed that he could not have known earlier that Dr. Hayne had inflated his educational achievements because Hayne was not questioned about them prior to his 2012 deposition.  Judge Virden concluded, "[I]f Ross was able to obtain these records in 2012, then certainly he could, with due diligence, have obtained them prior to the filing/amendment of his original habeas petition."  *Id*. at 36.

Although the posture of this case is somewhat different from *Ross*, and although the purpose of the analysis was somewhat different, the question of whether the factual predicate for the petitioner's claims was discoverable at an earlier date is roughly the same.  Like Judge Virden, the undersigned is of the opinion that the factual predicate of Osborne's claims was discoverable through the exercise of due diligence well before Dr. Hayne's 2012 deposition.

For purposes of AEDPA review, the one-year limitations period begins on "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim."  *In re* Young, 789 F.3d 518, 528 (5th Cir. 2015).  A petitioner may not wait until he "has discovered every conceivable claim for federal habeas relief."  *Manning v. Epps*, 688 F.3d 177, 190 (5th Cir. 2012).  Likewise, he may not wait until "every possible scrap of evidence" to support his claims has been gathered. *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998) ("Flanagan is confusing his knowledge of the factual predicate of his claim with the time permitted for gathering evidence in support of that claim.").  As the Court of Appeals for the Second Circuit reasoned, "[A] factual predicate consists only of the 'vital facts' underlying the claim."  *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (citing *McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007)).

Osborne's claims may be summarized as follows:

1.  The prosecution violated *Napue v. Illinois*, 360 U.S. 264 (1959), by presenting false evidence and testimony of:

    a.  Dr. Hayne's qualifications;

    b.  Time of death; and

    c.  The death mask.

2. The prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963) by withholding evidence of:

    a.  The State's business arrangement with Dr. Hayne;

    b.  Dr. Hayne's licensure and credentialing history;

    c.  Widely-accepted forensic pathology principles concerning time of death determinations; and

    d.  Previous contradictory testimony concerning time of death determinations.

3. The prosecution violated Osborne's Sixth Amendment right to confrontation because Osborne did not have the impeachment evidence described above regarding Dr. Hayne.

At this juncture, the undersigned expresses no opinion as to whether the evidence and testimony to which Osborne directs the Court's attention would actually impeach his trial testimony or whether Osborne suffered any prejudice from its exclusion. The Court's concern now is when the one-year statute of limitations on these claims began to run.

The limitations period for Osborne's *Napue* claims began when he could have discovered, through the exercise of due diligence, that Dr. Hayne's testimony on his qualifications was false, that Dr. Hayne's testimony regarding the time of Charlie's death was inconsistent with testimony that Hayne gave in other cases, and was also inconsistent with the opinions of other experts, and that use of a death mask is not standard forensic practice. The limitations on his *Brady* claim began when he could have known that the State's business arrangement with Hayne was at odds with the standards of professional objectivity, when he could have known that Hayne's licensure and credentialing history was different from his testimony, and when he could have known that Hayne's time of death testimony was at odds

with his prior testimony and widely-accepted forensic pathology principles.  Osborne's Confrontation Clause claim was based on the same material as the other claims, so the limitations period on it began at the same time as for the other claims.

To support his claims, Osborne relies heavily on the deposition that Dr. Hayne gave in April, 2012, in the defamation case of *Hayne v. The Innocence Project*, No. 3:09-cv-218-KS-LRA (S.D. Miss.).  During that deposition, attorneys for the Innocence Project presented Dr. Hayne with numerous documents, most, if not all, of which Osborne has referenced as supporting his claims.  A review of the many exhibits submitted in that case, however, belies his contention that the information he needed to file his habeas petition was not discoverable prior to that date.

Dr. Hayne's defamation claims were based on a fourteen-page letter written in April, 2008, to the Mississippi State Board of Medical Licensure by three attorneys representing the Innocence Project, Peter Neufeld, Vanessa Potkin, and W. Tucker Carrington.  The letter was a complaint that Dr. Hayne was engaging in unprofessional conduct and was unqualified to practice by virtue of providing false and misleading autopsy reports and testimony.  As a result of the allegations, the letter's authors informed the Board that they were actively seeking more evidence, and they asked the Board to revoke Dr. Hayne's medical license.  In particular, the authors directed the Board's attention to the following issues:

1. Dr. Hayne's claim that he conducts 1,500 autopsies per year;

2. Dr. Hayne's claim to have been qualified as an expert 4,000 times;

3. Dr. Hayne's misrepresentations of his credentials;

4. Dr. Hayne's knowingly false and misleading "medical" findings; and

5. Other potential misconduct.

Supporting these claims was a summary of Dr. Hayne's workload and a discussion of his

credentials.

Just before and just after this letter was sent, the Innocence Project had issued four press

releases.  The first, issued on February 8, 2008, criticized the work of Dr. Michael West on the

Kennedy Brewer and Levon Brooks cases.  It went on to state:

> West has routinely collaborated with Steven Hayne, a medical examiner for hire
> who conducts nearly every autopsy for prosecutors in Mississippi – even though
> he flunked his board certification.  He nets nearly $1 million a year from
> conducting autopsies across the state, and West helped set up the system that
> allows Hayne to handle so many autopsies (each year, Haynes conducts six times
> more autopsies than the recommended standard).
>
> . . . .
>
> "It's well known across Mississippi that Steven Hayne works closely with police
> and prosecutors to make determinations in autopsies that suit their criminal
> investigations and prosecutions. . . . Their [Hayne's and West's] hubris and
> misconduct sent the innocent Brewer to death row and the innocent Levon Brooks
> to languish in prison for the rest of his life,"  Neufeld said.  "These cases are an
> urgent call for a thorough review of how crime scene evidence gets analyzed and
> makes it into Mississippi courtrooms and how we can make sure only the most
> credible, objective, reliable science is used in criminal cases."

*Hayne*, 3:09-cv-218, Mot. to Dism. [Doc. #3], Exh. C at 3.  On February 15, 2008, a second

press release announced that a hearing held on that date resulted in the dismissal of charges

against the second of the two men convicted, Kennedy Brewer.  *Hayne*, Mot. To Dism. [Doc.

#3]. Exh. D at 2.  Following that announcement, the press release repeated the same information

about Dr. Hayne that was described above.

On March 5, 2008, the Innocence Project issued a third press release to announce that it

had sent out twenty-three formal requests under Mississippi's Public Records Act, Miss. Code

Ann. §§ 25-61-1 through -19 (Supp. 2016).  *Hayne*, Mot. To Dism. [Doc. #3], Exh. E at 1.  The

Innocence Project requested "all public records connected to autopsies conducted by Hayne at

state labs."  In its explanation for the requests, the Innocence Project's press release discussed

the cases of Kennedy Brewer and Levon Brooks, and stated:

> Just as Brooks was being released and Brewer was being exonerated last month,
> the Innocence Project and the Mississippi Innocence Project urged the
> Department of Public Safety to fill and help secure funding for the State Medical
> Examiner position, which has been vacant for more than a decade.  The State
> Legislature created the position in the 1980's to provide assistance and oversight
> for medical examiners across the state.  Hayne served briefly as Acting Medical
> Examiner in the 1990s, but he could not remain in the post because he
> lacks the proper board-certification.  Medical examiners are typically certified by
> the American Board of Pathology, but Hayne is not; he flunked the exam when he
> walked out, calling the questions "absurd."  Hayne and West forced the last State
> Medical Examiner out of the position in the 1990s, and it has been vacant ever
> since.  Once the last State Medical Examiner was out of office, Hayne began
> conducting more autopsies.  Professional standards say that when a medical
> examiner conducts more than 250 autopsies a year, he will begin to make
> mistakes.  Hayne says he conducts 1,200 to 1,800 autopsies a year.

*Id.* at 3.  In explaining the need for the information, Co-Director Neufeld stated:

> Autopsies with no scientific basis are unacceptable whether they're being done in
> a state lab or a private morgue, but there are serious repercussions for forensic
> misconduct in state labs.  Today, we are starting the important process of getting
> to the truth of Steven Hayne's work, which will allow us to take further action to
> hold him accountable.

*Id.* at 2.  Carrington added, "Given the volume of autopsies Hayne conducts, and the

complete lack of oversight for them, we need to determine the extent of the problem so

that we can bring accountability to the system and ultimately start restoring public

confidence in the criminal justice system."  *Id*.  Near the end of the press release, the

Innocence Project repeated the information contained in the earlier press releases about

Hayne's lack of certification.  The final press release was issued on August 8, 2008, and

it announced that Mississippi's Public Safety Commissioner had severed all ties with

Hayne, "who conducts 80% of all criminal autopsies in the state even though he is not

17

properly board-certified and his work has been seriously questioned in a number of

cases." *Hayne*, Mot. to Dism., [Doc #3], Exh. F at 2.

Also included in the documents filed in Dr. Hayne's defamation case in this Court were

two articles published in 2007 and 2008.  In 2007, an article appeared in *Reason* magazine

discussing Dr. Hayne's testimony in the capital murder trial of Tyler Edmonds, whose

conviction had been overturned, based partly on the admission of testimony from Dr. Hayne.  In

expressing his surprise at the "long overdue" rejection of Dr. Hayne's opinion, the writer stated,

"Hayne's career in court is an egregious example of what happens when the criminal justice

system fails to adequately oversee expert testimony."  *Hayne*, Mot. to Dism. [Doc #3], Exh. U

(Balko, Radley, *CSI: Mississippi; A case study in expert testimony gone horribly wrong,*

REASON, November 2007 at 1, http://reason.com/archives/2007/10/08/csi-mississippi).  After

describing similar situations in other states, Balko began his discussion of Hayne by noting the

number of autopsies he performed, in addition to holding other medical positions.  Then Balko

described Hayne's work in some specific cases to show that Hayne's work was substandard.  As

to Hayne's qualifications, Balko discussed Hayne's "certification," which was not given by the

American Board of Pathology, whose certification test Hayne failed.  According to Balko, the

lack of oversight into Hayne's operation permitted him to make far above the salary of most

state medical examiners:

> Hayne charges about $550 per autopsy.  According to several sources, Hayne
> receives fees for other services, such as drawing fluids or sending tissue to a lab
> for testing.  He then gets $195 per hour for trial preparation and testimony.
> That's just for state cases.  If a county coroner brings a body to him at the request
> of a plaintiff's attorney for a private tort action, Hayne has said in depositions, he
> charges $1,500 or more, plus $375 per hour for trial preparation and testimony.
>
> Hayne's efficient operation and reliable court appearances have allowed him to
> dominate the forensic autopsy business in Mississippi.  A 1992 internal memo
> from the state's Department of Public Safety estimated that Hayne performed 80

> percent of all forensic autopsies performed in the state.  Sources interviewed for
> this article say Hayne continues to do the vast majority of forensic autopsies in
> Mississippi.
>
> It's a racket," says [J. D.] Sanders, the former Columbus police chief.  "Most
> states pay a [state] medical examiner $100,000, maybe $200,000 per year.  Do the
> math.  Fifteen hundred autopsies per year at $500 to $1,500 a pop.  Hayne's
> making millions . . . . Prosecutors love him because he'll testify to whatever they
> need him to.  Meanwhile the state legislature saves money by not having to fund a
> full-time state medical examiner, office, and staff."

*Id.* at 7.  After critically describing Hayne's relationship with district attorneys throughout the

state, Balko quoted one forensic expert and textbook author, "You're not going to get any

change in a system where all the people in power are happy."

Nevertheless, according to Balko, two reform-minded pathologists attempted to change

the policy for assigning autopsies.  The first, Lloyd White, served as state medical examiner

from 1989 to 1993, leaving with the election of a new governor.  Before leaving, "he wrote a

blistering public letter to Charles Tisdale, editor and publisher of the *Jackson Advocate*, a hard-

hitting black paper sometimes called "the most firebombed newspaper in America."  *Id.* at 8-9.

Dr. White, in discussing a series of jail suicides, specifically called out Dr. Hayne, "noting that

despite his lack of credentials and poor practices, 'Hayne continues to autopsy jail and prison

deaths, as well as persons killed by police or sheriff's deputies, and to generate hundreds of

thousands of dollars in personal income as a result of his extremely cozy relations with . . . state

employees and officials."  *Id.* at 9.

The second reformer was Emily Ward, who succeeded White as state medical examiner.

After she proposed that the state medical examiner's office take on more of the autopsy work

that was being handed out to Hayne, Ward became the subject of an organized effort by friends

of Dr. Hayne to force her resignation by way of a petition signed by forty-two of the state's

eighty-two coroners.  As a result, the *Clarion Ledger* newspaper contacted thirty of the signers

and ran a story about it, noting that most of those coroners sent their autopsies to Hayne.  A
dissenter lamented that "a small group of individuals for whatever reason – for personal gain or
personal ego – have continued to badger Dr. Ward."  Dr. Ward left the state in 1995.  *Osborne
v. Fisher*, 3:13-cv-784, Pet. For Writ of Habeas Corpus [Doc #2], Exh. 7.

Osborne included another article from the *Clarion Ledger* as an attachment to his habeas
petition.  The article, *Doctor's autopsy abilities targeted*, written by Jerry Mitchell, was
published in the paper's April 27, 2008, edition.  *Osborne*, Pet. [Doc. #2], Exh. 2.  The article
reported on Hayne's certification issues and the excessive number of autopsies he performed.
Mitchell reported Hayne's income to be $825,000 from autopsies alone.  He quoted a New York
forensic pathologist as saying that Hayne "has made some serious mistakes."  *Id*. at 3.

Another article submitted in Dr. Hayne's defamation case was written in February, 2008,
and published in the *Jackson Free Press*.  *Hayne*, 3:09-cv-218, Mot. to Dism. [Doc. #3], Exh. L.
Reporting on the exculpation of Kennedy Brewer and Levon Brooks, the author noted that the
testimony of Dr. Michael West, a Hattiesburg dentist, and Dr. Hayne had been discredited.
According to the author:

> The Innocence Project is concerned about the "hubris and misconduct" of West
> and Dr. Steven Hayne, whose autopsy report, filmed by West, was judged
> inadmissible in the Jackson case, and who brought West in to consult on both
> cases.  Hayne performed autopsies on the victims in both cases, and he completes
> more than six times the recommended number of autopsies per year by his own
> admission in an unrelated deposition.  Hayne nets roughly $1million annually for
> performing as many as 1,800 autopsies a year at $550 each, and as a forensic
> expert for prosecutors two or three times a week, according to Radley Balko,
> editor of Reason magazine, in a widely circulated story titled "CSI: Mississippi."

*Hayne*, Mot. to Dism. [Doc. #3], Exh. L at 3 (Mott, Ronni, *Free at Last? Brewer May Go
Free Friday*, JACKSON FREE PRESS, February 13, 2008).

In addition to these published articles, in 2007, Dr. Hayne was criticized by the Mississippi Supreme Court in the Tyler Edmonds case.  In his concurring opinion on the reversal of Edmonds's conviction, Presiding Justice Oliver Diaz expressed grave concerns about Dr. Hayne's testimony, writing:

> While the majority finds that "Dr. Hayne is qualified to proffer expert opinions in forensic pathology," that determination is exclusively left to the trial courts; we only review that determination. No expert is *Daubert*-proof. As science, like the law, evolves over time, one generation's expert is another's quack.
>
> There are serious concerns over Dr. Hayne's qualifications to provide expert testimony. First, he admitted at trial that he was not certified in forensic pathology by the American Board of Pathology because he walked out on the qualifying examination. This means he is unqualified to serve as State Medical Examiner, as our law requires that "[e]ach applicant for the position of State Medical Examiner shall, as a minimum, be a physician who is eligible for a license to practice medicine in Mississippi and be certified in forensic pathology by the American Board of Pathology." Miss.Code Ann. § 41–61–55 (Rev.2005).
>
> Second, Dr. Hayne testified that in his twenty-five-year career, he has performed 25,000 to 30,000 autopsies. This would mean that he has performed at least 1,000 autopsies per year since he was admitted to practice, which seems highly unrealistic.
>
> Finally, a recent magazine article reported on another case where Dr. Hayne presented questionable testimony. The article examined his qualifications and even discussed his testimony in Edmonds' case:
>
>> Mississippi's forensic pathology system is, in the words of one medical examiner I spoke with, "a mess." The state has no official examiners. Instead, prosecutors solicit them from a pool of vaguely official private practitioners to perform autopsies in homicide cases. Steven Hayne, who performed the autopsy on Jones, appears to be a favorite. In the words of Leroy Reddick, a respected medical examiner in Alabama, "Every prosecutor in Mississippi knows that if you don't like the results you got from an autopsy, you can always take the body to Dr. Hayne." Defense attorneys in the state bristle at Hayne's name. In a case last year in Starkville, he testified that he could tell by the wounds in a corpse that there were two hands on the gun that fired the bullet, consistent with the prosecution's theory that a man and his sister team jointly pulled the trigger. Several medical examiners have told me such a claim is preposterous.

Hayne testified at Maye's trial that he is "board certified" in forensic pathology, but he isn't certified by the American Board of Pathology, the only organization recognized by the National Association of Medical Examiners and the American Board of Medical Specialties as capable of certifying forensic pathologists. According to depositions from other cases, Hayne failed the American Board of Pathology exams when he left halfway through, deeming the questions "absurd." Instead, his C.V. indicates that he's certified by two organizations, one of which (the American Board of Forensic Pathology) isn't recognized by the American Board of Medical Specialties. The other (the American Academy of Forensic Examiners) doesn't seem to exist. Judging from his testimony in other depositions, it's likely Hayne meant to list the American College of Forensic Examiners. According to Hayne, the group certified him through the mail based on "life experience," with no examination at all. Several forensics experts described the American College of Forensic Examiners to me as a "pay your money, get your certification" organization. A February 2000 article in the *American Bar Association Journal* makes similar allegations, with one psychologist who was certified through the group saying, "Everything was negotiable—for a fee."

Radley Balko, *The Case of Corey Maye,* Reason (Oct.2006) (citing Mark Hansen, *Expertise to Go,* 86 A.B.A.J. 44–52 (Feb.2000)).

Accordingly, this Court should not give Dr. Hayne, or any expert, a free pass to testify before our juries. With *Daubert,* we have equipped our trial judges with the appropriate tools to distinguish between qualified expert testimony and "quackspertise." It is up to them to make an individualized determination as to whether each expert meets the requirements of Rule 702.

*Edmonds v. State*, 955 So. 2d 787, 802-03 (Miss. 2007) (Diaz, J. concurring).

Osborne bases his habeas claims on the following evidence:

1.  The State's business arrangement with Dr. Hayne;

2.  The ABP exam that Dr. Hayne took and failed;

3.  Dr. Hayne's undergraduate record; and

4.  A "body of information" that represents a career's worth of pseudo-scientific time

    and cause of death testimony.

Summarizing the evidence described above it appears that enough information was publicly available to trigger the statute of limitations long before Hayne's deposition.

1. There is anecdotal evidence suggesting that, as early as 1992 or 1993, the *Jackson Advocate* ran a letter to the editor from Dr. Lloyd White criticizing Dr. Hayne's "lack of credentials and poor practices" that permitted him to "generate hundreds of thousands of dollars in personal income as a result of his extremely cozy relations with . . . state employees and officials."  This publication was over ten years before Osborne's trial.

2. Similarly, as early as 1995, the *Clarion Ledger* ran a story reporting on the efforts of several coroners associated with Dr. Hayne to force Dr. Emily Ward to resign as state medical examiner after she attempted to take on more of the state's autopsy work. This was also well before Osborne's trial.

3. In 2007, in his concurring opinion on the reversal of Tyler Edmonds's conviction for capital murder, a Mississippi Supreme Court Justice criticized Dr. Hayne's testimony in the case, noting that he failed the ABP exam and likely fabricated or exaggerated his other credentials.  The opinion relies on an article written by Radley Balko and published in October, 2006.

4. Also in 2007, another article written by Radley Balko was published, in which he repeats the information about Hayne's lack of certification.  In addition, the article estimated his annual income as "millions," noting that the Department of Public Safety estimated that he did 80 percent of all forensic autopsies performed in the state.

5. In February, 2008, the *Jackson Free Press* published an article describing Hayne's workload as "six times the recommended number of autopsies per year . . . .[and] nets roughly $1 million annually."  A few months later, the *Clarion Ledger* published an article describing Hayne's certification deficiencies, criticizing the number of autopsies he performed, quoting another forensic pathologist as saying that Hayne had made some serious mistakes, and estimating his income.

6. The Innocence Project issued a press release in February, 2008, reporting on Hayne's workload and his lack of board certification.  In March, the Innocence Project issued a press release accusing Dr. Hayne of forensic misconduct.  In August, the Innocence Project issued a press release announcing that the Public Safety Commissioner had severed all ties with Hayne.

7. The August press release also contained a link to the Innocence Project's fourteen-page letter to the State Board of Medical Licensure, written in April, 2008, and calling for the revocation of Dr. Hayne's license to practice medicine.  The letter goes into great detail on the deficiencies in Dr. Hayne's medical testimony in various cases and ultimately accuses him of "unprofessional, dishonorable, and unethical conduct likely to deceive, defraud or harm the public by providing false, fraudulent, or forged statements under the pretext of his allegedly 'medical expert' status."

The undersigned is of the opinion that Dr. Hayne's business relationship with the state was sufficiently described by all of these documents such that Osborne's limitations period began well before he obtained the letters from the Public Service Commission or the Ethics Opinion on their concerns about the arrangement.  As early as 1992 or 1993, an opinion letter to a local newspaper described the "cozy" relationship between Hayne and state officials that

24

resulted in his receiving thousands of dollars of personal income.  Every document described above, with the possible exception of the 1995 *Clarion Ledger* article, has recognized Hayne's domination of the state autopsy process and his resulting remuneration.

Similarly, the fact that Dr. Hayne failed the certification examination American Board of Pathology has been hammered home repeatedly.  The only additional information provided by the 2012 documents is that Hayne was failing the exam when he walked out, allegedly because he was insulted by a question.  As shown above, Hayne's lack of certification has been publicly discussed for years.  The ABP examination is precisely the "scrap of evidence" described in *Flanagan*.  To the extent that any of Osborne's claims are supported by Hayne's lack of certification, the limitations began to run from the time that Osborne knew, or should have known through the use of due diligence, that Hayne was not board certified, not the time when he received additional evidence of his test performance.  *Flanagan*, 154 F.3d at 199.

The receipt of Dr. Hayne's undergraduate records must be similarly analyzed.  They support no independent claim, but are part of Osborne's general complaint that Hayne exaggerated or falsified his credentials.  He argues that Hayne has testified that he was a straight-A student, carrying a load of up to thirty-nine units in a semester.  Apparently, his undergraduate transcript tells a different story.  At most, this amounts to impeachment evidence that would support his claim that Hayne was not truthful about his accomplishments, but that fact had been publicly revealed years before.

Finally, Osborne argues that he did not discover until 2012 a "body of information" that represents a career's worth of pseudo-scientific time and cause of death testimony.  The undersigned has reviewed Osborne's Opposition to the Motion to Dismiss, and it appears that the contention that this information is "newly discovered" is based upon the fact that it was

discussed in the 2012 deposition.  The cases from which the testimony was drawn, however, were tried well before that time.  The textbook cited by Osborne was published in 2001. Osborne argues that, as an incarcerated prisoner, he could not have actually obtained any of this information prior to 2012.

Citing *Starns v. Andrews*, 524 F.3d 612, 620-21 (5th Cir. 2008), Osborne argues that knowledge of any of this information cannot be imputed to him prior to the time that he or his counsel actually discovered it.  The undersigned disagrees.  *Starnes* is a good example of the difference between discovering the factual predicate for a claim and accumulating evidence to support it.  In *Starns*, the defendant in a murder case asserted self-defense at trial, arguing that the victim was the aggressor.  *Id*. at 614.  Neither the defendant nor his counsel was aware that the victim's employer had testified about her disturbed psychological state before one grand jury that failed to indict the defendant.  Prosecutors brought the case before another grand jury without the employer's testimony, and it returned an indictment for second degree murder.  *Id.*

The prosecutor ultimately informed the defense that the employer had testified before the grand jury, without specifying which one, so that his testimony could not be revealed.  Instead, the prosecutor downplayed the employer's testimony and indicated that it was not relevant to the charges.  *Id*. at 614-15.  Although defense counsel received contact information for the employer, the attorney apparently elected not to contact him.  After the defendant was convicted of manslaughter, the victim's parents brought a wrongful death action against him, a claim recoverable under his parents' insurance policy.  The attorney retained by the insurance company deposed the employer, who described the victim's behavior in the days before her death as suicidal.  The employer also testified that the victim told him that her past attempts at

suicide were too painful, and the next time she would find someone to do it for her. This is the testimony that was presented to the first grand jury. *Id*. at 615.

About a month after the deposition, the insurance company's lawyer sent a copy of the deposition transcript to the defendant's parents and to his criminal defense counsel. *Id*. The defendant filed a petition for habeas relief, asserting a *Brady* violation, and the primary question in the case before the court was whether he had filed his petition within the statutory limitations period. *Id.* at 616. Because the prosecution's representations about the employer's testimony indicated it would not be useful, the court held that the defendant did not fail to act with due diligence in pursuing it at trial. *Id*. at 619. The court went on to hold that the limitations period did not begin to run on the day of the deposition, noting that the attorney taking the deposition, although representing him in the civil suit, was not his lawyer for all purposes. *Id*. at 620. Remanding the case, the Court instructed the district court to determine when the criminal defense attorney received the transcript and began reading it, "because that is the date that [the defendant] learned of the *factual predicate* for his habeas claims." *Id*. (emphasis added). In other words, the defendant could not have known of the existence of a *Brady* violation until he knew that the prosecution withheld the employer's testimony from him – testimony that could have supported his claim of self-defense.

In Osborne's case, medical professionals have been critical of Hayne's work and his opinions since *before Osborne was tried*. Osborne's habeas claims rely on his assertion that significant impeachment evidence was unavailable to him at trial. The fact, however, that Hayne's testimony could be impeached as to his credentials, his financial arrangement with the state, and substantive errors in his medical opinions was known well before 2012. While some of the specific evidence discussed at his deposition would likely have been unavailable except

through a discovery request or subpoena, e.g. correspondence to and from Hayne, there was ample evidence available through easily accessible public sources as early as the mid-1990's.

Osborne also suggests that the Court should take into account his prisoner status and the concomitant limit to his ability for discovery.  The requirement of reasonable diligence, however, applies equally to represented petitioners and those proceeding *pro se*.  *Saahir v. Collins*, 956 F.2d 115, 117 (5th Cir. 1992).  "The question is no longer whether a petitioner *had* actual knowledge of the facts or legal supporting a habeas claim . . .  it is whether by reasonably diligent investigation, he *should have had* that knowledge."  *Woods v. Whitley*, 933 F.2d 321, 324 (5th Cir. 1991).  Thus, the Fifth Circuit refused to begin AEDPA's limitation period from the time that a prisoner actually became aware that it had been reduced to one year.  Finding that the grace period of one year from the effective date of the change was reasonable, the court held "Congress knew AEDPA would affect incarcerated individuals with limited access to outside information, yet it failed to provide any tolling based on possible delays in notice [of AEDPA's enactment]."  *Fisher v. Johnson*, 174 F.3d 710, 714 (5th Cir. 1999); *see also Felder v. Johnson*, 204 F.3d 168, 172 (5th Cir. 2000) ("[I]gnorance of the law or lack of knowledge of filing deadlines does not justify equitable tolling or other exceptions to a law's requirements.").

To fall within the limitations period of § 2244(d), Osborne bears the burden of showing: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Clarke v. Rader*, 721 F.3d 339, 344 (5th Cir. 2013).  As the Supreme Court reasoned earlier, "If what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what he does not know is irrelevant.  Omission of the claim will not be excused merely

28

because evidence discovered later might also have supported or strengthened the claim."

*McCleskey v. Zant*, 499 U.S. 467, 498 (1991).

Osborne has identified for the Court several examples of "fraudulent pseudo-scientific evidence" that have been offered by Dr. Hayne in testimony in other cases. *Osborne*, 3:13-v-784, Opp. to Mot. to Dism. [Doc. #17] at 14-16. As justification for his failure to bring them before the Court in an earlier habeas petition, Osborne explains:

> A close review of Dr. Hayne's testimony over time – an advantage previously unavailable because of an inability to access information such as autopsy reports and other materials that State officials refused to disclose – reveals that in a series of cases, Dr. Hayne provided critical testimony that was unscientific, directly contrary to his testimony in previous cases in the same subject matter area, and opposed by a consensus of credentialed forensic pathologists.

*Id*. at 15. The undersigned disagrees that Osborne would have to resort to autopsy reports or previously undisclosed material to know that Hayne had testified in the manner described by his counsel. Several of the examples listed are published cases; his testimony would likely have been summarized in the opinion issued on appeal. In one case, the source was identified as the trial transcript; nonetheless, the case was reported on appeal. *Young v. State*, 731 So. 2d 1145, 1147 (Miss. 1999). In reviewing Dr. Hayne's 2012 deposition, the undersigned noted that, while pieces of correspondence were described in the transcript as having been obtained during discovery, the same was not true for the trial transcripts of cases in which Dr. Hayne earlier testified and that were presented to him in his deposition. If counsel for the Innocence Project was able to obtain those records, they were not unavailable. Additionally, at least one litigant was able to attack Dr. Hayne's testimony in his case in a similar manner as Osborne has, and the Mississippi Supreme Court issued an opinion covering that issue in 2010:

> Moffett next argues that Dr. Hayne is not certified by a statutorily required board, but the statute he cites applies to the State Medical Examiner appointed by the Commissioner of Public Safety, not to every pathologist. *See* Miss.Code Ann.

29

§ 41–61–55 (Rev.2009). Moffett further argues that Dr. Hayne is not qualified to testify, because, in cases in which he has testified: (1) this Court has reversed convictions, (2) defendants have been exonerated, and (3) his opinions have been found not to be supported by facts. *See* \*1111 *Treasure Bay Corp. v. Ricard,* 967 So.2d 1235, 1242 (Miss.2007); *Edmonds v. State,* 955 So.2d 787, 791–92 (Miss.2007); *Brooks v. State,* 748 So.2d 736, 738 (Miss.1999); *Brewer v. State,* 725 So.2d 106, 115 (Miss.1998).

*Moffett v. State,* 49 So. 3d 1073, 1110–11 (Miss. 2010). The undersigned is of the opinion, therefore, that Osborne has not met his burden of showing that he exercised due diligence by waiting until after Dr. Hayne's 2012 deposition to file his Petition. While he did not have all of the information before the deposition that he has now, there was enough information available to him to alert him to a potential habeas claim based on Hayne's testimony in his trial.

## RECOMMENDATION

For all of the above reasons, the undersigned is of the opinion and recommends that Osborne's Petition is time-barred and should be dismissed.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Parties have 14 days to serve on the other parties and file with the clerk their written objections to the Report and Recommendation, specifically identifying the findings, conclusions, and recommendations to which the party objects. Opposing parties have seven days after service of objections, to serve and file a response. Only on grounds of plain error may a party attack on appeal any factual finding or legal conclusion to which he did not timely object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Signed, this the 21st day of February, 2017.

/s/ *Robert H. Walker*

ROBERT H. WALKER

UNITED STATES MAGISTRATE JUDGE